**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

TONY LOVE,

        Plaintiff,

v.

                                         CASE NO.:

SAINT PETERSBURG HOUSING
AUTHORITY,

        Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, TONY LOVE ("Plaintiff") by and through undersigned counsel, hereby sues Defendant SAINT PETERSBURG HOUSING AUTHORITY ("SPHA") and alleges as follows:

### INTRODUCTION

    1.    This is an action brought pursuant to the Family and Medical Leave Act ("FMLA"), a federal law that provides eligible employees of covered employers with job-protected leave for specified family and medical reasons.  Eligible employees may take up to 12 workweeks of leave in a 12-month period for a serious health condition that makes the employee unable to perform the essential functions of his or her job.  *See* 29 U.S.C. 2601, *et seq.*

### JURISDICTION AND VENUE

    2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

    3.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the state law contract and unpaid wages claims asserted herein which are so related to the federal claims that they form part of the same case or controversy.

· **LECHNER LAW** ·

4.      Venue is proper in this Court because all facts material to all claims set forth herein occurred in Pinellas County, Florida.

5.      This Court has personal jurisdiction over the parties. The SPHA, located at 2001 Gandy Blvd. N., St. Petersburg, FL 33702, was created pursuant to Florida Statutes Chapter 421 of the Florida Statutes to provide low-rent housing for qualified individuals in St. Petersburg, Florida.

## PARTIES

6.      The SPHA is a local governmental agency and a covered employer under the FMLA.

7.      Plaintiff, a citizen of Florida and resident of Pinellas County, is the former CEO of the SPHA, who was employed by the SPHA from late 2015 through August 30, 2019.

8.      Plaintiff is an employee within the meaning of the FMLA and an individual entitled to protection under the FMLA.  Plaintiff worked more than 1,250 hours for the SPHA during the 12 months prior to the start of FMLA leave and worked for the SPHA for more than 12 months.

## GENERAL ALLEGATIONS – EMPLOYMENT AGREEMENT

9.      On December 28, 2015, the parties entered into an Employment Agreement By and Between the Housing Authority of the City of St. Petersburg and Tony Love, Chief Executive Officer (the "2015 CEO Agreement").

10.      The provisions of the contract provide, in pertinent part:

> 4. REIMBURSEMENT OF EXPENSES. The CEO shall be entitled to reimbursement for any out-of-pocket expenditure reasonably incurred in the performance of his duties, in accordance with the Authority's policy on reimbursement expenses.  The CEO shall provide the Authority with adequate documentation to support his claims for reimbursement.

9.   INDEMNIFICATION.   The Authority shall defend, save and hold harmless, and indemnify the CEO against any tort, professional liability claim, or demand or other legal action, whether groundless or otherwise, arising out of an alleged act or omission occurring in good faith performance of the CEO's duties. The Authority will pay the amount of any settlement or judgment rendered on any such suit or claim.

(a)  The Authority shall provide to the CEO such indemnification as may be provided by statute or may be provided by the Authority, in its sole discretion, by Resolution, or as outlined by the Personnel Policy of the Authority, or consistent with the terms or through the maintenance of an Errors and Omissions Policy which shall cover the CEO in the same manner and amounts as the Board, including reasonable "tail" coverage. It is understood by the parties hereto that any errors and omissions policy shall remain in effect during the term of this Agreement.

11.    The 2015 CEO Agreement was amended on December 21, 2017 (the "2017 CEO Agreement").

12.    The 2017 CEO Agreement readopted the aforestated terms of the 2015 CEO Agreement, but amended Section 5(c) of the 2015 Employment Agreement by replacing it as follows:

(c) Accrued annual leave and sick leave benefits, holiday pay, and health, dental, life and disability insurance and other employee benefits shall be in accordance with the Authority policies, except in the case of the CEO who shall receive thirty (30) days of annual leave that shall accrue at the beginning of each calendar year to begin January 1, 2018, that he may use at his discretion. The Authority shall pay a portion of medical coverage cost as stipulated in the Personnel Policy.

13.    On October 3, 2018, the parties renewed the aforestated contract terms for a three-year term commencing January 1, 2019 (the "2018 CEO Agreement"). A copy of the 2018 CEO Agreement is attached hereto as **Exhibit A.**

14.    In the performance of his duties as CEO, Plaintiff reasonably incurred out-of-pocket expenditures in the form of legal fees as a result of Plaintiff requiring legal counsel to respond to legal threats and accusations against him from third parties, including the City of St. Petersburg.  Such threats and accusations contained false allegations, *inter alia*, that Plaintiff

committed improprieties or misfeasance in performing his duties.

15.     Plaintiff's out-of-pocket expenditures in the form of legal fees were reasonably incurred because, *inter alia*, they arose out of alleged acts or omissions occurring in good faith performance of Plaintiff's duties and were expressly approved by the SPHA and the SPHA Board Chair Delphinia Davis prior to being incurred.  The SPHA approved Plaintiff hiring the law firm Johnson Pope for this purpose and approved reimbursing Plaintiff for the law firm's fees incurred.

16.     On January 24, 2019, Board Chair Davis approved in writing the first invoice of $5,689.00 for reimbursement of the aforestated reasonably incurred legal fees.  In turn, Plaintiff was reimbursed for this sum.  In total, Plaintiff reasonably incurred $40,573.50 in legal fees (including the $5,689.00 expressly approved by the SPHA Board Chair and paid by the SPHA) in reliance upon the SPHA's preapproval of those fees and legal services.

## GENERAL ALLEGATIONS – FMLA

17.     On or about June 26, 2019, Plaintiff was diagnosed with a serious health condition that involved a period of incapacity of more than three consecutive, full calendar days, during which Plaintiff was unable to perform the essential functions of his job and required subsequent continuing treatment by a health care provider.

18.     That same day, Plaintiff submitted a request, pursuant to SPHA's usual and customary requirements for requesting leave, for a leave of absence for a FMLA-qualifying reason, namely the aforestated serious medical condition.  Plaintiff was approved for FMLA leave and took approximately two weeks of leave, from June 26, 2019 through July 11, 2019.

19.     Upon Plaintiff's return from leave, the SPHA began retaliating against him because he took FMLA leave.  For instance, the new SPHA Chair, Stephanie Owens, sought a legal opinion from SPHA's outside counsel, Charles M. Harris, seeking a basis for reneging on the SPHA's prior

approval of reimbursement of his reasonably incurred legal fees.  On August 20, 2019, Mr. Harris replied to Chairperson Owens with a memorandum wrongly recommending "that the Board make demand upon the CEO for repayment of the CEO's personal legal expenses."

20.     In August 2019, Plaintiff again suffered a serious health condition that involved a period of incapacity of more than three consecutive, full calendar days, during which Plaintiff was unable to perform the essential functions of his job and required subsequent continuing treatment by a health care provider.

21.     On August 28, 2019, Plaintiff submitted a second request, pursuant to SPHA's usual and customary requirements for requesting leave, for a leave of absence for a FMLA-qualifying reason, namely the aforestated serious medical condition.  As he only took roughly two weeks of leave in June/July, Plaintiff had not come close to exhausting his twelve weeks of legally-protected FMLA leave.

22.     In the FMLA paperwork Plaintiff submitted to the SPHA, Plaintiff's medical provider indicated that Plaintiff would be unable to work and needed FMLA leave from August 28, 2019 through September 3, 2019, due to the aforestated serious medical condition.

23.     Two days later, on August 30, 2019, the SPHA held an "Emergency Meeting" to discuss for the first time the purported "crisis in leadership that SPHA is facing."  Specifically, the SPHA Board spoke at length bemoaning the fact that Plaintiff went out on FMLA leave and then voted to terminate Plaintiff's employment, with Commissioner Sharlene Gambrell-Davis voting "no."

24.     During the August 30, 2019, the SPHA Board stated that the termination was based upon the fact that Plaintiff "placed himself on medical leave this week without consulting any board members," and that there was particular concern that Plaintiff took FMLA medical leave "as

the agency is making emergency preparations for Hurricane Dorian."

25.     There is no requirement in SPHA's usual and customary requirements for an employee requesting leave to "consult" with the Board members prior to taking medical leave. Moreover, even if there was a weather-based exception to FMLA leave requirements (which there is not), Hurricane Dorian never came close to making landfall in Florida, had practically no effect whatsoever on the west coast of Florida in particular and did not even become a hurricane (near the Greater Antilles) until after Plaintiff submitted his FMLA leave request.

26.     Plaintiff has been required to retain the undersigned counsel to represent him in this action and is obligated to pay them a reasonable fee for their services.

**COUNT I**
**FMLA INTERFERENCE**

27.     Plaintiff realleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1 through 26.

28.     Defendant interfered with Plaintiff's FMLA rights by, *inter alia*, discouraging Plaintiff from using FMLA leave, calling an "emergency meeting" two days after Plaintiff went out on FMLA leave to terminate his employment, failing to maintain Plaintiff's coverage under its group health plan on the same basis as coverage would have been provided if Plaintiff had been continuously employed during the entire leave period, reneging on the SPHA's prior approval of reimbursement of his reasonably incurred legal fees, terminating his employment while on FMLA leave, failing to give Plaintiff all requisite FMLA rights and responsibilities notices, and failing to return Plaintiff to the same or similar position upon expiration of his leave.

29.     Defendant's actions discussed herein interfered with Plaintiff's lawful exercise of his FMLA rights.

30.     Defendant's actions constitute plain violations of the FMLA.

31.     As a result of Defendant's unlawful actions, Plaintiff has suffered damages as follows:

   a.     Lost pay and benefits;
   b.     Interest;
   c.     Liquidated damages;
   d.     Attorneys' fees and costs pursuant to the FMLA;
   e.     Equitable relief and prospective relief in the form of reinstatement and implementation of appropriate corrective actions; and
   f.     Such other relief as is permitted by law.

WHEREFORE,  Plaintiff, TONY LOVE, respectfully requests all legal and equitable relief allowed by law including judgment against Defendant, SPHA, for the foregoing economic and non-economic damages, prejudgment interest, payment of reasonable attorneys' fees and costs incurred in the prosecution of the claim and such other relief as the Court may deem just and proper.

## COUNT II
## FMLA RETALIATION

32.     Plaintiff realleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1 through 26.

33.     Defendant retaliated against Plaintiff for asserting his FMLA rights by, *inter alia*, reducing Plaintiff's pay by reneging on the SPHA's prior approval of reimbursement of his reasonably incurred legal fees, calling an "emergency meeting" two days after Plaintiff went out on FMLA leave to terminate his employment, by terminating his employment while on FMLA leave and by refusing to pay Plaintiff his full accrued annual vacation and leave time upon termination of employment.

34.     Defendant's actions constitute plain violations of the FMLA.

35.     As a result of Defendant's unlawful actions, Plaintiff has suffered damages as follows:

a.    Lost pay and benefits;
b.    Interest;
c.    Liquidated damages;
d.    Attorneys' fees and costs pursuant to the FMLA;
e.    Equitable relief and prospective relief in the form of reinstatement and implementation of appropriate corrective actions; and
f.    Such other relief as is permitted by law.

WHEREFORE,  Plaintiff, TONY LOVE, respectfully requests all legal and equitable relief allowed by law including judgment against Defendant, SPHA,  for  the  foregoing economic and non-economic damages, prejudgment interest, payment of reasonable attorneys' fees and costs incurred in the prosecution of the claim and such other relief as the Court may deem just and proper.

### COUNT III
### BREACH OF CONTRACT

36.    Plaintiff realleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1 through 26.

37.    Pursuant to the terms of the 2019 CEO Agreement, the SPHA could terminate Plaintiff's employment "for cause," in which case Plaintiff is entitled to severance and all accrued annual leave time.

38.    The SPHA purportedly terminated Plaintiff's employment "for convenience"; yet, the agreement does not permit termination for this reason.  It is true that the agreement does purport to allow for termination "without cause," with payment of three months' salary at annual salary rate plus all accrued annual vacation and leave time, however this provision is unlawful and unenforceable in that payment of the severance is premised upon the CEO executing "a release of claim as a condition precedent to receiving the severance…."

39.    Not only is the term "release of claim" impermissibly vague (e.g. it does not allow for many of the provisions SPHA inserted into the proposed severance agreement), but also many

8

employment statutes (including the FMLA) prohibit employers from requiring a release as a condition precedent. Therefore, SPHA has breached the employment agreement by failing to adhere to the termination terms.

40.    Moreover, even assuming the termination "without cause" provision was valid (which it is not), SPHA has further breached the agreement by failing to pay the full severance plus all accrued annual leave time by improperly deducting expenses that were payable by the SPHA. Pursuant to the 2019 CEO Agreement, Plaintiff shall receive thirty (30) days of annual leave that shall accrue at the beginning of each calendar year to begin January 1, 2018. Plaintiff was not paid for such leave time.

41.    Accordingly, Plaintiff is entitled to be paid through the remainder of his contract term of 28 months = $382,666.00, plus the contractually required benefit and annual leave set forth above and other compensatory damages, as well as COBRA payments (Oct. – Dec. 2019) of $422.17 x 3 months = $1,266.51.

42.    Further, pursuant to the contractual terms, the SPHA shall reimburse Plaintiff and indemnify him for all out of pocket legal expenses = $40,573.50 (minus $5,689.00 prior former Chair Approval) = $34,884.50. The SPHA has breached the employment agreement by refusing to reimburse and/or indemnify Plaintiff for these legal expenses.

43.    Plaintiff has demanded payment of his full contractual remedies plus reimbursement of his reasonable attorneys' fees and costs, but SPHA has refused.

WHEREFORE, Plaintiff prays for the following relief: Awarding damages in the amount set forth herein, awarding consequential damages, plus attorneys' fees and costs pursuant to Fla. Stat. § 448.08, and awarding all such other relief as the Court deems just and appropriate.

## COUNT IV
## <u>UNPAID WAGES</u>

44.     Plaintiff realleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1 through 26.

45.     This is a common law claim for unpaid wages.

46.     Plaintiff was an employee of Defendant SPHA.

47.     Pursuant to the 2019 CEO Agreement, Plaintiff shall receive thirty (30) days of annual leave that shall accrue at the beginning of each calendar year to begin January 1, 2018. Plaintiff was not paid for such leave time.

48.     At the time of his termination, Plaintiff had 208 hours of accrued leave time for a total compensation of $15,749.99.

49.     Plaintiff's unpaid leave constitutes unpaid wages which are owed and payable by Defendant pursuant to Florida Statute Chapter 448.

50.     Defendant, despite Plaintiff's reasonable attempts to obtain payment of these earned monies, has failed and refused to make payment to Plaintiff as required by Florida Statute Chapter 448.

51.     As a result of Defendant's failure to pay earned wages, Plaintiff has suffered damages, including unpaid salary, interest and attorneys' fees.

WHEREFORE, Plaintiff prays for the following relief:  Awarding damages in the amount of the unpaid salary owed, plus attorneys' fees and costs pursuant to Fla. Stat. § 448.08, and awarding all such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury as to all issues.

Dated this 17th day of December, 2019

Respectfully submitted,

/s/ Jay P. Lechner_____
**LECHNER LAW**
Jay P. Lechner, Esq.
Florida Bar No.: 0504351
Jay P. Lechner, P.A.
Fifth Third Center
201 E. Kennedy Blvd., Suite 412
Tampa, Florida 33602
Telephone: (813) 842-7071
jplechn@jaylechner.com
shelley@jaylechner.com
*Attorneys for Plaintiff*

EMPLOYMENT AGREEMENT BY AND BETWEEN

THE HOUSING AUTHORITY OF THE CITY OF ST. PETERSBURG

AND

TONY LOVE, CHIEF EXECUTIVE OFFICER

AGREEMENT made this ___3rd___ day of October , 2018, by and between the Housing Authority of the City St. Petersburg, an autonomous, quasi-municipal entity that is a political subdivision of the State of Florida (hereinafter "the Authority), and Tony Love.

WITNESSETH:

WHEREAS, the Housing Authority of the City of St. Petersburg is a Housing Authority operating pursuant to Chapter 421, Florida Statues, the Annual Contributions Contract with the United States Department of Housing and Urban Development (hereinafter "HUD"), and under the applicable laws, guidelines and/or regulations of HUD, as may be amended, and any future laws, guidelines and/or regulations which may hereafter be promulgated during the terms of this Agreement, for the purpose of providing housing, either by way of rental or home ownership opportunities, to low and moderate income persons in and around the City of St. Petersburg, Florida; and

WHEREAS, the Parties hereby enter this Employment Agreement in order to: secure and retain the services of Tony Love, as Chief Executive Officer of the Authority.

Now therefore, for and in consideration of the mutual promises and covenants herein, the Authority and Love agree as follows:

1.   **DUTIES**.  The Authority hereby employs the Chief Executive Officer (CEO) of the Housing Authority of the City of St. Petersburg.  His powers and duties in that capacity are outlined in the Bylaws of the Authority and as to be determined by any laws, applicable HUD regulations, other federal and state laws or regulations, the Job Description of the CEO (attached hereto as Exhibit "A"), and by the direction and decision of the Board of Commissioners of the Authority (hereafter the "Board").

(a) The CEO accepts employment and hereby agrees that, for the consideration hereinafter set forth, he shall perform the duties of CEO of the Authority and perform the duties of Secretary to the Board at all meetings, to include but not be limited to, at regular, special, annual meetings and/or as otherwise required by the Bylaws of the Authority or this Agreement.

2.   **TERM**.  The initial term of this Agreement shall be for three (3) years from the date of this Agreement.  For the purposes of the Agreement, the initial three year term of this Agreement shall be deemed to have begun on January 1, 2019.

# EXHIBIT A

(a) The CEO may terminate this Agreement at his discretion upon giving ninety (90) days written notice to the Authority.  The CEO shall incur no penalty for such termination and shall be entitled to full pay through the date of said termination, and shall also be entitled to any accrued benefits through the date of such termination in accordance with the term of the Agreement, provided the CEO may not take vacation time during this period without the prior approval of the Authority.  Should the CEO give the Authority notice under this Section, the Authority may select a date of termination which is earlier than the date identified by the CEO.

(b) The Authority may terminate the employment of the CEO for cause upon the following grounds; (1) failure on the part of the CEO to comply with Authority policy or federal, state, or local laws and regulations; (2) failure by the CEO to comply with any lawful decision or directive of the Board; (3) for activities on the part of the CEO constituting material malfeasance to be determined solely by the Board; (4) substandard and/or inadequate performance; (5) activity by him reasonably determined by the Board to be detrimental to the goals, objectives, or reputation of the Authority; or (6) any conduct that rises to the level of Sexual or other Harassment or Discrimination to be determined by the Board.

Termination by the Authority under this clause shall require at least four votes of all Commissioners in office.

As practical, it is the intent of the Parties that before rendering a decision to terminate employment for cause or other discipline for cause that the Board, as practical, will follow the policy and procedures as dictated by the Personnel Policy of the St. Petersburg Housing Authority.

(c) Should the Authority select a date for termination under Paragraph 2 (b), the CEO shall receive at least four weeks' notice or, if the Board votes the termination effective immediately or some amount of time less than four weeks, the CEO shall receive four weeks' severance pay to include all accrued annual leave pay.  Accrued sick leave shall be paid if the CEO has attained the age of fifty-five (55) and years of service, minimum of five (5), must equal sixty-five (65) or more. Such compensation shall be limited to fifty percent (50%) of the balance in the illness leave account, not to exceed two hundred forty (240) hours. The CEO must execute a release of claim as a condition precedent to receiving the severance provided for in this paragraph.

(d) At least ninety (90) days prior to the Termination Date of this Agreement, the Board shall review CEO's performance in relation to the duties set forth in the job description attached hereto as **Exhibit A** (as may be revised from time to time by the Board) and such goals and objectives as determined by the Board.  CEO is expected to provide input to assist the Board with setting goals and objectives.  If, in the sole discretion of the Board, the CEO's performance is satisfactory, the Term of Employment shall be extended for an additional term of one (1) year following the Termination Date.  If, in the sole discretion of the Board, the Executive Director's performance is not satisfactory, the Board shall notify the CEO of this determination and the Term of Employment shall not be extended.

2

Should the Board fail to act before the Termination Date, the Term of Employment shall automatically be extended for an additional term of one (1) year following the Termination Date. Thereafter, this Agreement shall review for additional one (1) year successive periods, unless Employee receives written notice from the Board, at least sixty (60) days prior to the Anniversary date of the Agreement that the Commission wishes to terminate, or otherwise amend this Agreement.

(e) Notwithstanding any provision of this Agreement to the contrary, the Authority may terminate the CEO at any time without cause for any reason whatsoever. If CEO is terminated pursuant to this paragraph, then the CEO shall receive a sum equal to three (3) months salary at the annual salary then in effect plus unused annual leave time. The CEO must execute a release of claim as a condition precedent to receiving the severance provided for in this paragraph.

3. **COMPENSATION AND PERFORMANCE APPRAISAL.**

(a) For the initial year of this Agreement, the Authority shall pay to the CEO as full compensation for services rendered in the amount of One Hundred and Fifty-Seven Thousand and Five Hundred Dollars and 00/100 Cents ($157,500.00). For each succeeding year, the Authority agrees to adjust the CEO's salary in such amounts and to such extent as the Board shall determine in its sole and absolute discretion that is desirable to do so, on the basis of an annual Performance Appraisal of the CEO. The CEO and the Personnel Committee appointed by the Board of Commissioners shall meet on at least an annual basis to determine the desired goals and objectives to be included in and evaluated by the Performance Appraisal System, as determined by the Board. CEO is expected to provide input to assist the Board with setting goals and objectives.

(b) The Performance Appraisal System shall be based upon a goal-setting process, which shall include a set of goals and/or objectives to be satisfactorily accomplished by the CEO. The goals of which the CEO is to be held accountable will become part of each annual Performance Appraisal, and a copy of which is to be part of and attached to the Agreement for the applicable year of the performance appraisal of the CEO.

(c) The Performance Appraisal shall be conducted on an annual basis. If the Board shall fail to conduct an annual Performance Appraisal, the CEO's compensation shall advance by five percent (5%) provided, however, that said advancement shall not occur until twenty (20) days after the CEO has delivered a written notice in the form of a letter to the Chairperson of the Board of Commissioners indicating that such advancement will take place in the absence of an annual performance appraisal.

(d) In addition to the compensation provided for in this Agreement, the Board may, in its sole and absolute discretion, pay the CEO an annual incentive performance payment. Such payment shall be based upon the CEO's successful performance of certain comprehensive strategic objectives as determined by the Board, and shall be in an amount to be determined by the Board of Commissioners.

3

(e)  Per Rise Development Corporation:   In the event a development fee is earned during the course of any development or redevelopment venture, said fee shall be assignable to the St. Petersburg Housing Authority

**4.   REIMBURSEMENT OF EXPENSES**.   The CEO shall be entitled to reimbursement for any out-of-pocket expenditure reasonably incurred in the performance of his duties, in accordance with the Authority's policy on reimbursement expenses.  The CEO shall provide the Authority with adequate documentation to support his claims for reimbursement.

**5.   BENEFITS.**  The CEO is entitled to all of the following Benefits:

(a)   Base salary.  As his entire initial base salary for all services rendered by the CEO under this agreement, the Authority agrees to pay to the CEO a salary at the annual rate of One Hundred and Fifty-Seven Thousand and Five Hundred Dollars and 00/100 Cents ($157,500.00); payable in the manner that all Authority employees are paid during the term of this Agreement, commencing on January 1, 2019, and continuing until this Agreement is terminated, less all applicable withholdings and deductions. Not withstanding anything herein to the contrary, the Authority reserves the right, in the event of a documented financial crisis which necessitates an across the board adjustment to the salaries of all employees of the Authority by the Board, to adjust the CEO's salary at the same percentage rate of adjustment as all other employees of the Authority.

(b)  A monthly allowance of $600.00 for using his own vehicle in lieu of an automobile supplied by the Authority shall be paid to the CEO.

(c)   Accrued annual leave and sick leave benefits, holiday pay, and health, dental, life and disability insurance and other employee benefits shall be in accordance with the Authority policies, except in the case of the CEO who shall receive thirty (30) days of annual leave that shall accrue at the beginning of each calendar year to begin January 1, 2018, that he may use at his discretion.  The Authority shall pay a portion of medical coverage cost as stipulated in the Personnel Policy.

(d)   Pension plan in accordance with the terms of the plan made available to all Authority employees.

(e) A Term Life Policy, to include Live, Disability and Accidental Death and Dismemberment (AD&D) coverage is paid by the Authority.  AD&D shall pay 2.5 times the annual base salary plus eight thousand five hundred dollars ($8,500.00).  The CEO may elect to purchase additional coverage under the policy.

(f)   Monthly deferred compensation payments of $791.66 to be paid into the retirement account.

4

(g)     All provisions of the regulations and rules of the Authority relating to increases in, accruals of, and reimbursement for annual leave, sick leave, retirement and pension system contribution, holidays and other fringe benefits, and working conditions as they now exist or hereafter may be amended, also shall apply to the CEO as they would to the other exempt supervisory personnel of the Authority, in addition to said benefits enumerated specifically for benefit of the CEO except as herein provided.  However, it is recognized that the CEO's position with the Authority is unique, and there will be numerous situations and circumstances as to which the regular personnel policy should not apply.

6.     **PROFESSIONAL DUES & SUBSCRIPTIONS**.  The Authority agrees to encourage and pay for the professional dues and subscriptions of the CEO as are necessary for his continuation and full participation in national, regional, state, and local associations and organizations for his continued professional participation, growth, and advancement.  The CEO is encouraged to represent the Authority and become a member of civic clubs or organizations, and the Authority agrees to pay all expenses necessary for such membership and participation. Further, the Authority agrees to pay all reasonable and necessary travel and related expenses incurred by the CEO in attending meetings of said organizations.

7.     **DISABILITY**.  A Disability Insurance Policy is to be paid by the Authority which will provide for a ninety (90) day disability threshold period before payments are triggered.

(a) If the CEO is disabled or is otherwise unable to perform his duties because of sickness, accident, injury, mental incapacity or health, , for a period of twelve (12) successive weeks beyond any accrued sick leave, the Authority shall have the option to terminate this Agreement, subject to the severance payment requirement.  However, the CEO shall be compensated for any and all accrued sick leave, vacation, holidays, and other accrued benefits.

8.     **SUSPENSION**.  The Board may suspend the CEO with full pay and benefits at any time during this Agreement.

9.     **INDEMNIFICATION**.  The Authority shall defend, save and hold harmless, and indemnify the CEO against any tort, professional liability claim, or demand or other legal action, whether groundless or otherwise, arising out of an alleged act or omission occurring in good faith performance of the CEO's duties.  The Authority will pay the amount of any settlement or judgment rendered on any such suit or claim.

(a) The Authority shall provide to the CEO such indemnification as may be provided by statute or may be provided by the Authority, in its sole discretion, by Resolution, or as outlined by the Personnel Policy of the Authority, or consistent with the terms or through the maintenance of an Errors and Omissions Policy which shall cover the CEO in the same manner and amounts as the Board, including reasonable "tail" coverage.  It is understood by the parties hereto that any errors and omissions policy shall remain in effect during the term of this Agreement.

10.     **CONFLICTS OF INTEREST**.  In addition to complying with any and all applicable federal, state, and local laws and requirements governing conflicts of interest, the CEO

shall not engage in any business or transaction or have financial interest or other personal interest, direct or indirect, which is incompatible with the proper discharge of his official duties or which would tend to impair independence of judgment or action in the performance of official duties, nor participate in the negotiation or the making of any contract with any business or entity in which he would have a financial interest.

11. **RESTRICTIVE COVENANT**.

(a)   During the term of this Agreement (or any automatic extension hereof), the CEO shall devote his best interests and substantially all of his working hours to advance the interest of the Authority, unless otherwise approved by the Board of Commissioners. The CEO shall not directly or indirectly, alone or as a member of a partnership or as an officer, director, or shareholder of another corporation, be engaged in any commercial duties or pursuits during the normal working hours of the Authority, unless otherwise approved by the Board of Commissioners. In addition, the CEO must also regularly represent the Authority at times which are not normal "working hours;" it is agreed that even during non-business hours, the CEO shall be available to satisfactorily perform duties which may require his presence or attention on behalf of the Authority.

(b) Under no circumstances shall this paragraph be understood to restrict the CEO's ability to make passive investments or to otherwise earn or receive fees which require only limited time and attention. Limited consulting activities, with the permission of the Board, will be permitted and reasonable fees may be paid to the CEO for such activities. Nor shall this restrictive covenant be construed to include teaching, writing, or consulting performed on employee's time off.

12. **WAIVER OF BREACH**. (a)  Waiver by either party hereto of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach by such waiving party.

13. **NOTICE**.   Any notice pursuant to this Agreement shall be in writing and mailed to the following addresses:

CEO:    Mr. Tony Love
8382 66th Way NorthPinellas Park, FL 33781

The Authority:    Housing Authority of the City of St. Petersburg
Attention: Chairperson of the Board of Commissioners
2001 Gandy Blvd. North
St. Petersburg, FL  33702

14. **CHOICE OF LAW**.  This Agreement shall be construed and regulated under and by the laws of the State of Florida, and shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns; provided however, that the CEO may not assign, delegate, or otherwise transfer any rights or obligations arising hereunder without the prior written consent of the Authority (which consent may be

6

withheld in the Authority's sole discretion).  No failure on the part of either party hereto at any time to require the performance by the other party of any term of this Agreement shall be taken or held to be a waiver of such term or in any way affect such party's right to enforce such term, and no waiver on the part of either party of any term of this Agreement shall be taken or held to be a waiver of any other term hereof or the breach thereof.

15.    **VENUE & JURISDICTION**.  All disputes arising under or in connection with this Agreement shall be addressed in the Circuit Court for the Sixth Judicial Circuit located in Pinellas County, Florida, or U.S. District Court in Tampa, FL as appropriate.  If litigation is commenced in any court of competent jurisdiction to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to reasonable costs, including attorneys' fees, incurred in connection with the litigation.

16.    **BINDING EFFECT**.  The terms of this Agreement shall be binding upon and to the benefit of the parties hereto and their respective personal representatives, successors, and assigns.

17.    **ENTIRE AGREEMENT**.  This Agreement contains the entire Agreement between the parties hereto with respect to the transactions contemplated herein and supersedes all previous representations, negotiations, commitments, and writings with respect thereto.

18.    **CONFLICTS OF AUTHORITY**.  In the event of a conflict between this Agreement and any applicable federal, state, or local law or requirement, such federal, state, or local law or requirement shall control.

IN WITNESS WHEREOF, the parties have hereunto fixed their sign and seal, the day and year first above written.

[SIGNATURES ON NEX PAGE]

THE HOUSING AUTHORITY OF THE CITY OF ST. PETERSBURG

Delphinia Davis, Chair                Date: 1/18/19

Tony Love, Chief Executive Officer    Date: 12/17/18

10127529

10119903/10-3577

8